IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

REBECCA IRENE TALBOT, an
individual citizen of the State of Oregon,

           Plaintiff,                        No.  03:12-cv-00141-HZ

     v.

NEW SEASONS MARKET, LLC, an
Oregon limited liability company, fka              OPINION & ORDER
NEW SEASONS MARKET, INC., an
Oregon for-profit corporation,

           Defendant.

Linda L. Marshall
PMB 408
3 Monroe Parkway
Suite P
Lake Oswego, Oregon 97035

     Attorney for Plaintiff

1 - OPINION & ORDER

Carol J. Bernick
Blake J. Robinson
Christie S. Totten
DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2300
Portland, Oregon 97201

     Attorneys for Defendant

HERNANDEZ, District Judge:

     Plaintiff Rebecca Talbot brings this action against defendant New Seasons Market, alleging that defendant terminated her in violation of the federal Family Medical Leave Act, 29 U.S.C. §§ 2601-2654 (FMLA), and wrongfully discharged her. Defendant moves for summary judgment. I grant the motion.[1]

BACKGROUND

     Plaintiff worked for defendant as a meat clerk in defendant's Sellwood store from July 2002 to December 2002. In January 2003, New Seasons promoted plaintiff to the receiver position where she worked until her termination in November 2009.

     In 2008, plaintiff began to experience what she called "extraordinary pain," which caused her to call in sick about one each month. Pl. Depo. at 113-14, 123.[2] In January 2009, she was diagnosed with an ovarian cyst. Id. at 119. Before applying for FMLA leave, she tried to keep information about her condition and her pain private. Id. at 117.

     In August 2009, plaintiff applied for intermittent leave under FMLA. Id. at 118-19, 151.

---

     [1] Despite being granted two requests for an extension of time to respond to the summary judgment motion, plaintiff failed to file a response.

     [2] Excerpts from plaintiff's deposition are attached as Exhibit 1 to Robinson's Declaration. Citations are to the deposition page, not the exhibit page. In contrast, citations to deposition exhibits, also attached as part of Exhibit 1 to Robinson's Declaration, are to the exhibit page.

2 - OPINION & ORDER

In deposition, she stated that it became apparent to her that absenteeism was a "huge issue," and therefore, she filed for FMLA leave because she was missing "repetitive time" and was afraid she was going to lose her job because she was sick.  Id. at 119.  Plaintiff's leave was approved on or about September 21, 2009, with an effective date of September 17, 2009.  Id. at 106.  Jon Rich, plaintiff's supervisor, received email notification of her FMLA leave approval on September 22, 2009.  Ex. 1 to Robinson Decl. at 105 (Pl. Depo. Ex. 11).

In the fall of 2009, plaintiff asked the Sellwood store's wine steward, Alan Hill, to special order a French wine for her.  Pl. Depo. at 164-66.  Plaintiff agreed to purchase an entire case of the wine because, as Hill informed her, he did not intend to carry the wine at the store.  Id. at 165-67.  When the wine arrived, on November 20, 2009, plaintiff told Hill she was unsure if she still wanted the entire case.  Id. at 167.  Hill told plaintiff that the wine "[is] in my way, so take it, try it, let me know what you think.  If you want to buy it, great.  If not, I can probably sell it. . . . just let me know.  And then if you decide you want to keep it, let me know if there [are] any bottles floating around com[e] inventory time."  Id. at 167-68.  Plaintiff did not understand whether, according to Hill, she should try one bottle or take the entire case.  Id. at 168, 174. Later that day, plaintiff found the entire case of the wine on her desk which she assumed had been placed there by Hill.  Id. at 170.  Plaintiff then took the entire case of the wine to her car without paying for it.  Id. at 171-72, 188, 190.

Plaintiff finished her shift, then took the wine home with her.  Id. at 188.  She tried the wine over the weekend and liked it.  Id.  She planned to give one bottle to a friend, take one to her family's Thanksgiving, and keep two more for herself, bringing the total number of bottles to five.  Id.  The rest remained in her trunk.  Id. at 189.  She planned to pay for the five bottles the

following Monday, November 23, 2009.  Id. at 190.  When she arrived at work on that Monday, she did not immediately pay for the wine because she was busy right at the start of her shift at 7:00 a.m.  Id.

Taking product from the store without paying for it violates defendant's employment policies.  Ex. 1 to Robinson Decl. at 100 (Pl. Depo. Ex. 6).  Defendant does allow employees to take outdated or soon-to-be-spoiled products free of charge.  Pl. Depo. at 89-90.  However, even these items cannot be removed from a store without a "blue slip," which plaintiff described as a piece of paper signed by the department head responsible for the product, authorizing the employee to take it.  Id.

A co-worker of plaintiff's, Andrew Anderson, saw plaintiff take the wine from the store and put it in her car.  Id. at 256.  He found her actions "curious" and reported his observation to Rich.  Ex. 1 to Robinson Decl. at 109 (Pl. Depo. Ex. 22).  At about 7:30 a.m. on November 23, 2009, Rich called plaintiff into his office where plaintiff met with Rich and Paul Munoz from human resources.  Pl. Depo. at 192.  Rich told plaintiff she was seen leaving the store with a box of wine and asked if she had paid for it.  Id.  She told him no, but she added that she and Hill had an "agreement and understanding" that plaintiff was to take the wine home and try it and tell Hill if she liked it or not.  Id.  She asked Rich to clarify the situation with Hill.  Id.  Hill suspended plaintiff for the day pending further investigation.  Id.

Munoz called plaintiff later that day and asked her to meet at 10:00 a.m. the next morning.  Id. at 197.  Rich also called her and told her that "what [Hill] said about it wasn't exactly what [plaintiff] said."  Id. at 198.  Plaintiff went to work at 7:00 a.m. the next day.  Id.  When she went to write a check to a vendor, she saw that her final paycheck had been written.

4 - OPINION & ORDER

Id. She called Rich and tried to explain that talking to Hill would "clear all of this up." Id. at 200, 220. She conceded to Rich that "it may have been a boneheaded maneuver in judgment" for her to walk out of the store with the wine without having paid for it, but, she told Rich, "there was nothing, no ill intent, there was no malice[.]" Id. at 220.

Plaintiff then met in person with Rich, Munoz, assistant store manager Tracy Smith, and Elizabeth Nardi, defendant's director of operations. Id. at 201. She told the group that this was all a misunderstanding which Hill could confirm. Id. Nonetheless, defendant terminated plaintiff for taking wine from the store without first paying for it. Id.

STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Celotex, 477 U.S. at 322-23.

The substantive law governing a claim determines whether a fact is material. Suever v.

Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. Long v. City & County of Honolulu, 511 F.3d 901, 905 (9th Cir. 2007).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Id. (citation omitted).

DISCUSSION

I. FMLA Claim

The FMLA entitles an employee to take a total of twelve weeks of leave during any twelve-month period when "a serious health condition" "makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). In her Complaint, plaintiff contends that her termination violated FMLA because it was in retaliation for her applying for, being granted, or using intermittent FMLA leave and it interfered with her right to future use of intermittent FMLA leave. Compl. at ¶ 11.

The Ninth Circuit has discussed the difference between FMLA's "interference" provision and its "discrimination" and "retaliation" provisions. Bachelder v. Am. West Airlines, Inc., 259 F.3d 1112, 1124 (9th Cir. 2001). Because of the statute's structure, the "anti-retaliation" or "anti-discrimination" provisions "do not cover visiting negative consequences on an employee simply because he has used FMLA leave. Such action, is instead, covered under § 2615(a)(1), the

provision governing '[i]nterference[.]" <u>Id.</u>; <u>see</u> <u>also</u> <u>Liu v. Amway Corp.</u>, 347 F.3d 1125, 1133

n.7 (9th Cir. 2003) (noting that some circuits have held that claims in which the plaintiff alleged

that her she was subjected to an adverse employment action for taking FMLA protected leave,

are properly brought under section 2615(a)(2), but that in the Ninth Circuit, section 2615(a)(1)

properly applies to employees who request or take FMLA leave and as a consequence are

subjected to unlawful actions by the employer; further noting that in the Ninth Circuit, section

2615(a)(2) applies only to employees who oppose employer practices made unlawful by FMLA).

Although plaintiff has styled her FMLA claim as a retaliation and interference claim, I

consider the claim to arise under 29 U.S.C. § 2615(a)(1), and not under section 2615(a)(2) or

section 2615(b).  Defendant represents that plaintiff's counsel has agreed that plaintiff brings only

an interference claim under section 2615(a)(1).  Def. Mem. at 13.

To prevail in a claim under this section, plaintiff must show that she took FMLA

protected leave, that she suffered an adverse employment action, and that the adverse action was

causally related to her FMLA leave.  <u>Bachelder</u>, 259 F.3d at 1125 (to succeed on FMLA

interference claim under section 2615(a)(1), plaintiff must show by a preponderance of the

evidence that the taking of FMLA protected leave constituted a negative factor in the decision to

terminate the plaintiff or to visit other adverse employment actions upon the plaintiff).  Because

it is undisputed that plaintiff applied for FMLA leave in August 2009, and presumably began

taking FMLA leave thereafter, and that she suffered an adverse action when defendant terminated

her on November 24, 2009, I address only the causation issue.

In support of her contention that defendant considered her FMLA leave as a negative

factor in its decision to terminate her, plaintiff testified as to conduct by Rich that she believed

exposed his hostility toward her taking FMLA leave.  These include an incident when Rich wrote

her up for excessive absenteeism, another when he and Munoz "coached" her about absences on

holidays and inquired about her FMLA leave, Rich's displeasure at absences with little notice,

emails from Rich exposing his displeasure with her leave, and other behaviors by Rich including

excluding plaintiff from his clique and giving her the "silent treatment."

First is a July 23, 2009 written "corrective action" addressing an absence by plaintiff on

that date which brought the total number of absences in the previous twelve months to nine.  Ex.

1 to Robinson Decl. at 97 (Pl. Depo. Ex. 3).  In her deposition, plaintiff explained that defendant

uses a "rolling calendar year" for tracking absences and an employee receives a warning at a

certain point if the employee has been absent "so many times."  Pl. Depo. at 79.  When she met

with Rich about this warning, on or about August 4, 2009, she told him that three of the absences

were excused for vacation or other reasons.  Id. at 76-77; Ex. 1 to Robinson Decl. (Pl. Depo. Ex.

3).  Rich allowed her to correct the information.  Id.  Rich did not ask plaintiff about FMLA

leave during his meeting with her.  Pl. Depo. at 76.  In fact, given that the absence triggering the

corrective action was in July 2009 and she did not apply for FMLA leave until August 2009,

there is no causal connection between this incident and plaintiff's protected FMLA leave.

Second, sometime in September or October 2009, plaintiff was "called into the office" by

Rich and Munoz to talk about her attendance and to be "coached" about her attendance.  Id. at 57.

Although she could not remember the exact date, later in the deposition she testified about an

absenteeism warning she received on September 16, 2009, making it likely that the meeting with

Rich and Munoz occurred on or about that date.  See id. at 77.  At this meeting, Rich and Munoz

told plaintiff that other staff members were concerned about her calling in sick on holidays.  Id.

at 57-58.  She explained that this was a mere coincidence.  Id. at 58.

Plaintiff testified that Rich and Munoz then inquired about her FMLA leave.  Id. They asked her "where I was as far as my health, and what it meant and about future care that I would need or time that I would need off" and how her condition was treated.  Id. at 59.  They inquired about what she would need medically moving forward, about treatment, the possibility of surgery, and when she would be missing work.  Id. at 59-60.

Third, plaintiff testified that she was nervous about applying for FMLA leave because she believed it was "quite inconvenient" for Rich because she "was not required to call in four hours ahead of time like other folks."  Id. at 120, 130.  But, when asked if Rich said anything to her or did anything to her that made plaintiff aware of the alleged inconvenience, she noted only the previously-identified "coachings" of absences that she said were sometimes based on approved absences or incorrect dates.  Id.  Additionally, plaintiff testified that before being approved for FMLA leave, she had called in sick without four hours notice for the very same condition, and could not recall having been spoken to or disciplined for insufficient notice.  Id. at 151-52.  She further testified that Rich never told her she had to give any particular notice, before or after she applied for FMLA leave.  Id. at 150.

Fourth, plaintiff testified that emails Rich sent showed his displeasure with her leave, but when pressed to identify them, she could point to only one.  Id. at 136.  The email in question is in a string of emails beginning with one sent on September 21, 2009 from Human Resources Specialist Cindi Espy to Munoz informing Munoz that "Jenny" had approved plaintiff's "leave request for an intermittent leave starting 9/17/2009, for one day every four weeks."  Ex. 1 to Robinson Decl. at 106 (Pl. Depo. Ex. 11).  The next day, Munoz forwarded the email to Rich,

stating "fyi." Id. at 105-06. The following day, Rich wrote an email to Munoz stating, "[n]ot to

pry too deep. . . but this is every 28 days. . . do we have an idea as to when that should be -- since

there have already been 2 in 2 weeks that have been described as this. . ." Id. at 105. When

questioned about this email during deposition, plaintiff pointed to the ellipses and stated that "it

means there is more to say or read between the lines." Pl. Depo. at 143. She acknowledged that

nothing in the email other than the ellipses indicated that Rich was upset with her taking FMLA

leave. Id. She then conceded that there was nothing in the email that told her that Rich was

biased against her or upset or unhappy that she was taking FMLA leave. Id. She ultimately

characterized it as "[j]ust inquiry." Id.

The remaining evidence plaintiff noted in deposition in support of her claim that

defendant terminated her because of her FMLA leave is that there were documents of another

employee in her personnel file, that Rich would be burdened by having to arrange for coverage of

her shift, that Rich treated her differently than other employees in his clique, and that he

sometimes gave her the "silent treatment." None of these bear any relation to her FMLA leave.

When plaintiff was terminated, she requested a copy of her personnel file. Id. at 120,

134. Paperwork for an employee named "Allison Talbot" was in the file. Id. at 120, 274. She

does not know who put the documents there. Id. at 134. Without more, the fact that documents

of another employee bearing the same last name of plaintiff appeared in her personnel file does

not create an issue of fact regarding causation.

In terms of covering her shift, plaintiff believed Rich would be burdened by having to

arrange for coverage of her shift, but she admitted that he never told her that it was burdensome.

Id. at 249-50. She also could not recall ever being told that her absences caused difficulty for any

10 - OPINION & ORDER

employee, whether it be a manager or staff.  Id. at 80.

Plaintiff testified that Rich treated members of his clique differently than those outside of his clique.  Id. at 42, 45, 54.  But, whether an employee was in or out of this clique did not depend on whether the employee had taken sick leave or been sick.  Id. at 42.  Rather, plaintiff explained, "you got in and out of his clique . . . . by your own choice."  Id. at 42.  She named several people whom she considered to be in this clique and explained that Rich treated them differently by having expectations "different than expectations of other employees not in the clique."  Id. at 43.  But, upon questioning, plaintiff acknowledged that many of the people in the clique had used sick leave at one time or another, yet they remained in the clique.  Id. at 47-50. The evidence does not support an inference that FMLA or sick leave played any part in being a member of Rich's alleged clique.

Finally, plaintiff described receiving what she called the "silent treatment" by Rich after returning from sick leave.  Id. at 40.  She stated that he would respond to her if she asked a direct question but would otherwise ignore her.  Id. at 41.  In plaintiff's opinion, this was evidence of Rich making "it clear that he was unhappy that I was not at work."  Id.  She provided no particular date or time when this occurred.

Even when viewed in a light most favorable to plaintiff, the record contains insufficient evidence to create an issue of fact as to causation.  The vast majority of Rich's conduct that plaintiff described in her deposition is not related to her request for, or use of, FMLA leave.  She creates no inference of the required "negative factor" with her testimony regarding (1) the alleged burden to Rich caused by her FMLA leave; (2) the alleged inconvenience to Rich by being excused from an alleged four-hour call-in requirement, (3) any emails by Rich, (4) the fact that

another employee's documents were in her personnel file, (5) being excluded from Rich's alleged

clique, and (6) receiving the "silent treatment" from Rich.  At best, plaintiff's testimony on these

issues shows only that she subjectively believed that Rich was unhappy with her periodic sick

days.  Her subjective belief is not supported by any facts and cannot, by itself, demonstrate

causation.  See Hutchinson v. Menlo Logistics, Inc., No. 03:04-cv-00940-HA, 2006 WL 44196,

at *6 (D. Or. Jan. 9, 2006) (plaintiff's subjective impressions as to why he felt that he had

received a lowered evaluation score were insufficient to establish causation in state law

retaliation claim),

        The incident in which Rich and Munoz discussed plaintiff's FMLA leave with her also

does not show that her request for, or use of, FMLA leave was a negative factor in the decision to

terminate her.  The meeting was called to discuss a report by other employees regarding

plaintiff's calling in sick on holidays.  Nothing in that portion of the meeting shows any bias by

Rich as to plaintiff's FMLA leave.

        Additionally, none of the questions Rich and Munoz allegedly asked plaintiff at the end

of that meeting regarding her FMLA leave, her condition, and her predicted future needs and

treatment, evidenced any hostility by Rich or Munoz toward plaintiff's FMLA leave.  Even

looking at this discussion in a light most favorable to plaintiff, the discussion amounts to nothing

more than Rich, as plaintiff's supervisor, inquiring about plaintiff's needs and how the FMLA

leave was going to be used presently and in the future.  The meeting, based on a reading of the

entire record, appears to have occurred almost simultaneously with the mid-September 2009

approval of plaintiff's request for FMLA leave.  Although plaintiff had repeatedly called in sick

for her ovarian cyst condition before being approved for FMLA leave[3], because the leave request

was not previously formalized by FMLA and was now approved as a once per twenty-eight day

leave, Rich undoubtedly had questions about its implementation.  There is simply no evidence of

any question or discussion hostile to plaintiff's FMLA leave occurring at this meeting.  Moreover,

an employer is entitled to obtain from the employee "the necessary details of the leave to be

taken." 29 C.F.R. § 825.302(c).[4]

 Finally, it is undisputed that plaintiff took a case of wine from the store without first

paying for it.  Defendant's employee handbook states that it "will not tolerate theft of product,

money or property."  Ex. 1 to Robinson Decl. at 100 (Plf Depo. Ex. 6).  It makes clear

that"[s]tealing will end [the employee's] employment with [New Seasons.]"  Id.  The handbook

also explains that "[t]aking, eating or drinking products without first paying for them (or

---

 [3] Plaintiff's repeated use of sick leave for her ovarian cyst before her FMLA leave request does not appear to have been met with negative consequences other than the one July 2009 "corrective action" in which the total number of her sick days over the prior twelve months was thought to have been nine.  When plaintiff pointed out that three of those had been approved absences and should not be counted, plaintiff was allowed to correct that record.  Thus, the record shows that defendant had not retaliated against plaintiff for the repeated use of sick leave for her condition before her FMLA request.  Nothing about the FMLA request changed the nature of frequency of the leave.

 [4] I presume that if plaintiff had filed a response to the motion, she would have argued that the temporal proximity between her request for leave in August 2009 and her November 2009 termination, or alternatively, the September 2009 discussion about her FMLA leave with Rich and Munoz and her November 2009 termination, is sufficient to create an issue of causation.  I reject this argument.  As Judge Hubel explained in a 2009 decision, the law in the Ninth Circuit is unclear if temporal proximity can create an issue of fact on causation in a FMLA case.  Davis v. Pac. Saw & Knife Co., No. 03:08-cv-00676-HU, 2009 WL 936471, at *13 (D. Or. Apr. 6, 2009).  But, even accepting that it could, a time period of three months (August to November 2009), or two months (September 2009 to November 2009) is insufficient.  Id. (holding that two-month period was insufficient; noting that Supreme Court cases suggest that periods of three and four months are insufficient).

receiving a blue slip authorizing you to have it) is stealing." Id.  Although plaintiff's conversation with Hill was not clear as to whether Hill suggested that plaintiff try one bottle of wine or take the entire case, plaintiff agrees that he did not tell her she could take the wine without paying for it.  Pl. Depo. at 71-72 .  Plaintiff does not dispute that she did not pay for the case of wine and that she was not given a blue slip before she took the case of wine out of the store, a clear violation of New Season's anti-theft policies.  I grant summary judgment to defendant on plaintiff's FMLA claim.

II.  Wrongful Discharge

To support a common law wrongful discharge claim under state law, plaintiff must show that she was discharged "for exercising a job-related right that reflects an important public policy" or for "fulfilling an important public duty." Eusterman v. Nw. Permanente, P.C., 204 Or. App. 224, 229, 129 P.3d 213, 217 (2006).  Plaintiff must establish "'a causal connection between a protected activity and the discharge.'" Perez-Denison v. Kaiser Found. Health Plan of the Nw., 868 F. Supp. 2d 1065, 1084-85 (D. Or. 2012) (quoting Este v. Lewis & Clark Coll., 152 Or. App. 372, 381, 954 P.2d 792, 796 (1998)).

Although the Complaint does not identify the nature of the right or public duty at issue, plaintiff presumably bases her wrongful discharge claim on the exercise of her FMLA rights because those are the only rights referenced in the Complaint.  For the reasons explained above, I grant summary judgment to defendant on the wrongful discharge claim because plaintiff fails to create an issue of fact indicating that her FMLA leave was a negative factor in the decision to terminate her.

/ / /

14 - OPINION & ORDER

CONCLUSION

Defendant's motion for summary judgment [14] is granted.

IT IS SO ORDERED.

Dated this ___27___ day of ___Dec.___, 2012

_Marco A. Hernandez_
Marco A. Hernandez
United States District Judge

15 - OPINION & ORDER